Llewellyn Howell, Philip Howell, Urias Mathias, hus-
band of Margaret Mathias, deceased, Bertha Mathias,
of lawful age, William H. Mathias, Frank S. Mathias,
minors, and having Philip Howell as their guardian,
all three being children and heirs of Margaret Mathias,
who died since suit brought, Adley C. Howell, Martha
Howell, Samuel W. Howell and Francis L. Howell *v.*
Thomas Mellon, W. L. Scott and the Youghiogheny
River Coal Company.

*Parol sales of real estate—Parol partition—Evidence—Charge of court
upon testimony—Question for jury.*

A., by his last will and testament, devised the use of his farm to his
widow, until the youngest child should become of age, and directed that
it should then be sold. He gave to his widow the right to elect whether
the sale should take place at the time designated by him or not until her
death. She elected that it should remain unsold until her death. Nine
children survived the testator, and they elected to take the farm as
realty. Ejectment was brought by the children of J., one of the sons of
the testator, who claimed title as the devisees of L., another of the sons of
the testator. In support of their title the plaintiffs relied upon parol sales
alleged to have been made in 1836 and 1837 by the children of the testator
to their three brothers, J., L. and P., and a subsequent parol partition by
which the land in controversy became the property of L., under whom they
claimed to have the title. The defendants asserted title under J., the father
of the plaintiffs, who claimed to be the owner of seven eighths of the land
as heir at law, and as the vendee of six other heirs at law of the testator,
and by whom conveyances of their title were made.

The defendants had been in possession of the land claiming title for
forty years, and plaintiffs were asserting an equitable title, of which the
only evidence of a parol contract was to be gathered from the declarations
of the parties to strangers, there being an entire absence of any proof of
parol contract made between the plaintiffs and the other heirs for a pur-
chase of their interest or shares in said land at an agreed price, except
the interest of L., which was the undivided one eighth part, and the undi-
vided one third of the shares of S. and M., two of the daughters of the
testator, which became vested in L., whose title the plaintiffs held. There
was also no direct proof of the parol partition, and the evidence of such
partition having been made, was to be gathered from declarations of the
parties, and was wanting in definiteness and certainty. The trial judge
instructed the jury that if the testimony of plaintiff was believed, it was
sufficient to establish the parol sale and the parol partition. *Held*, to be
error in that the charge under the evidence was insufficient, as it left to

the jury only the question of the credibility of the witnesses. The court should have directed the attention of the jury to the vague and uncertain character of the testimony, and if they failed to find from the weight of the whole evidence that such agreements were made as claimed by the plaintiffs, then the plaintiffs could only recover the one undivided one eighth and the one undivided one third of the shares of S. and M., from whom they held conveyances.

Argued Nov. 5, 1894. Appeal No. 28, Oct. T., 1894, by defendants, from judgment of C. P. No. 2 of Allegheny Co., July T., 1891, No. 666, on a verdict for the plaintiff. Before STERRETT, C. J., WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Reversed.

Equitable ejectment for a tract of coal land situate in Elizabeth township, Allegheny county, containing 64.68 acres. Before EWING, P. J.

The material facts of this case will be found in the charge of the trial judge and in the opinion of the Supreme Court.

Llewellyn Howell, Sr., died in 1823, seized of a large tract of land, of which the tract in controversy is a part, leaving to survive him his widow, Mary, and nine children : John, Llewellyn, Andrew, Philip, James, Sarah, Martha, Esther and Mary. The material part of his will is as follows :

" I demise and bequeath unto my loveing wife Mary, all my household furniture, likewise all my personal property except the stills and appendages which my son Lew Ellen is to have the use of the one equal half, all of which is to be kept or disposed of at the discretion of my Executors for the use of herself and family during state of her widowhood as likewise the use of the farm until my son James arrives at the age of twenty-one years. Except such property as has been named to my children yet at home by me at which time the place is to be sold by my Executors and the two thirds of the proceeds to be equally devided to and amongst my heirs and the one third to be at intrist foor the use of my Sd. wife, but if in the opinion of my said wife such sale would be prejudicial to her intrist she may detain the Sale and possess the land by paying the two thirds of the rent as long as she sees Cause or during state of her widowhood, but if she should mary she only to have an equal part with one of the children, all the surplus property

which will be Remaining at the death of my said wife to be sold and the proceeds Equally Divided to and Amongst my children, Together with the proceeds of the land when sold Except what of my children as have already goten property which is to be Considered out of their part."

The widow elected that the farm should not be sold during her widowhood. The plaintiffs claimed that John, Philip and Llewellyn, Jr., had purchased by parol the interests of the other heirs, and elected to treat the property thereafter as realty, and made an amicable partition thereof among themselves; that by virtue of said purchase and partition, Llewellyn, Jr., became seized in fee of a large portion of said tract of land, embracing, inter alia, the property in controversy ; that he improved the same and held possession thereof for many years, and up to the time of his death, which occurred in January, 1851, having made a will the material portion of which is as follows :

"I will bequeath unto my brother Andrew Howell the one undivided half parts of the Farm whereon I now reside Embracing and including the buildings for and during his natural life Subject to the payment of the hereinafter bequests and also Subject to Mothers dower. And then I will and devise Same unto his children them their heirs and assigns but in case he the Said Andrew Howell Should die without issue then in that case I will & devise the Same unto my brother John Howells children to them their heirs and assigns Share & Share alike. I will & bequeath unto my brother James Howell the one undivided North half of the farm whereon I now reside Embracing & including the Mill property for and during his natural life Subject to the payment of the hereinafter named bequests and also Subject to Mothers dower and at his death I will & devise the Same unto his children to them their heirs and assigns Share & Share alike. And in consequence of the bequests that I have herein made to Andrew and James Howell I order and direct that they Shall each remise & release unto John & Philip Howell all manner of claim or claims that they may have of in or to the Land whereon the said John & Philip now reside."

They also claimed that Andrew Howell died without issue in May, 1891, and that John Howell died in August, 1894, leaving surviving him the following named children, to wit:

Llewellyn, Philip, Margaret, Adley C., Martha, Samuel W., and Frances L., who are the plaintiffs in this case, and entitled to the premises in controversy by virtue of the said will of Llewellyn Howell, Jr.

The defendants, on the other hand, claimed that John, one of the children of Llewellyn Howell, Sr., purchased the interests of five of his brothers and sisters in said real estate, viz: Esther, by deed dated 19th of April, 1852; the heirs of Sarah by deed dated 14th of October, 1852; Philip by deed dated Sept. 31, 1852; Martha by deed dated March 12, 1853; Andrew by deed dated Sept. 12, 1863; and that John thus became seized of six undivided eighth parts or shares, including his own, in said land; and also by the deed of Andrew Howell, he obtained the half of the share of Llewellyn, Jr., who devised his share to Andrew and James; that in an action of ejectment between James and Andrew against John a consentible verdict was rendered, allotting James 50 acres of said land of which Llewellyn, Sr., died seized as and for his share in the will of his father, and half share in the will of his brother Llewellyn, Jr.  They further claimed that Mary Howell remained the widow of Llewellyn, Sr., until her death in 1853, retaining possession of the whole farm under the provisions of the will until the marriage of her son John, when she assigned part of it to his use, she retaining the residue and occupying the homestead thereon until her death; at which time John entered into sole possession of the farm, remaining in exclusive possession until the 50 acres thereof were allotted to his brother James, and thereafter continuing in sole and exclusive possession of the estate and residue thereof until the sale made by him to Thomas Mellon of all the coal and part of the surface of the farm, including the coal in dispute in this case, by a deed dated Aug. 25, 1863; that Thomas Mellon sold the same to William L. Scott, one of the defendants, by a deed dated March 22, 1881.  Defendants further alleged that Thomas Mellon, under whom said William L. Scott holds, was a bona fide purchaser in fee from John Howell, the father of the plaintiff, for a valuable consideration, and without any notice or knowledge of the alleged title set up in this suit by the plaintiffs; and that said Scott was a bona fide purchaser from Mellon for a valuable consideration, without any knowledge of said alleged claim; that the farm of

which Llewellyn, Sr., died seized contained less than 150 acres for mining and commercial purposes, and less than 100 acres, exclusive of the 50 acres set apart to James Howell by said action of ejectment. Defendants also denied that John, Philip and Llewellyn, Jr., purchased the interests of the other heirs of Llewellyn, Sr., and made an amicable settlement among themselves, and also that the Youghiogheny River Coal Company holds under said Scott.

At the trial plaintiffs offered depositions of old and infirm witnesses to prove that they had heard statements made by the several children of Llewellyn, Sr., that they had sold out their interests to their three brothers, Llewellyn, John and Philip, and statements made by Llewellyn, John and Philip that they had made a parol partition, and that Llewellyn remained in exclusive possession of his purpart under said parol partition up to the time of his death; that John and Llewellyn had pointed out the fence which marked the line between them. All this testimony was objected to; the objections were overruled, and bills sealed for defendants. [1-17]

Defendants offered in evidence the will of Mary Howell, to be followed by proof that she claimed to have bought Llewellyn, Jr.'s, interest in the land to counteract testimony of John Woods to the effect that Llewellyn was an owner beyond the extent of his own share under his father's will; also agreement between James Howell with R. and S. Woods dated November 23, 1854, for his interest in the land; testimony of Thomas Mellon to show that John, vendor, was in possession when Mellon purchased, and the explanations of John to said Mellon regarding the absence of title in writing for Llewellyn, Jr.'s, individual share; testimony of witnesses who were present at the action of ejectment between James and Andrew Howell and John Howell, and the statements and declarations made by the parties themselves on the witness stand. This testimony was objected to by the plaintiffs; the objection sustained by the court and bill sealed for defendants. [18-22]

The court charged the jury as follows:

" The plaintiffs in this case are seven children of John Howell. They claim, not through their father, John Howell, but they claim by virtue of the will of their uncle, Llewellyn Howell, Jr., who died in 1851, and devised land as follows:

" 'I will and bequeath unto my brother, Andrew Howell, the undivided one-half part of the farm whereon I now reside, embracing and including the buildings, for and during his natural life, subject to the payment of the hereinafter bequests ; and subject to mother's dower; and then, I will and devise the same unto his children, them, their heirs and assigns ; but in case he, the said Andrew Howell, should die without issue, then, in that case, I will and devise the same unto my brother John Howell's children, to them, their heirs and assigns, share and share alike.' And then he devises to his brother, ' James Howell, the undivided north half of the farm whereon I now reside,' for his life, and to his children, he to pay some legacies, among them one to John.

" Andrew Howell, the uncle, never had any children, and he died in 1891. The plaintiffs are conceded to be the children of John Howell referred to in the will. Whether or not they were born in 1851, when Llewellyn Howell made his will, is not important. There is no doubt under the evidence that the farm referred to includes in part, at least, the land now in dispute, the sixty-eight acres of coal. It is not in dispute that Llewellyn Howell had lived for a long time and died in the house that was then and is now standing on the land, subject of this ejectment. Now, if Llewellyn Howell had no title to that land at the time of his death, his will did not convey any title to these plaintiffs. If he had a good title to it, then these plaintiffs are entitled to it, unless there is something intervening shown to defeat their title and right.

" The defendants claim under John Howell, by a conveyance from John Howell, made in 1863, and in the larger portion of this case I wish to treat it as if it was a question between the plaintiffs and John Howell, the father, (there are some other questions that I will discuss separately,) because if the plaintiffs could not recover as against John Howell, they have no shadow of a case against the present defendants ; if they could, then other questions arise.

" The land is a part of a larger tract. Llewellyn Howell, Sr., died, it seems, in 1823, having made his will, by which he devised this land practically to his executors named, with directions to sell when the youngest child arrived at the age of twenty-one, and divide the two thirds of the proceeds among

the children, the other one third to remain to his widow for life; but with the provision, also, that his wife might forbid the sale as long as she lived, and hold the land by paying two thirds of the rent to the children. It was in law a conversion of it, and the children did not take it as land at all; they had but an equitable interest in the land as the material from which the legacies were to be paid. It was personal property, and each of the children who was of age could sell his or her interest in it without a deed; or without a writing, even. If one of them bargained to sell his interest to John or Llewellyn or Philip, he could do it, just as if it had been a horse or a cow or money or anything else, and the only difference between there being a writing or not, and the only difference between its being recorded or not, would be the difficulty of proving it; that is all there is in it. It remained personal property and not land, until all the parties having an interest in it at the time agreed to treat it as land. If all but one agreed to treat it as land and the other did not, it still was not land. A conveyance of it in the form of an interest in the land would be good as an assignment of the interest. The fact that the assignment of the interest of one of the parties is in the form of a deed for land, does not avoid it at all; it is good as an assignment of the claim.

" [Now, we have been asked to say to you as a matter of law, that before Mr. Mellon's purchase in 1863, all the children had agreed to treat it as land. That is a matter of fact for you; the court would have no difficulty in finding that that was the case, still, it is a question of fact.] [32]

" [There seem to have been nine children, although perhaps until this trial, or until after the trial began, the attorneys on either side supposed there were but eight. These were Llewellyn, the oldest of the sons, Andrew, John, Philip and James; (James is said to be the youngest of the family,) and there were four sisters; according to the account, one of them married a Hindman and died within a month, one of the witnesses says, and this is corroborated in a statement in one of the papers about John having a ninth interest in the land. That interest being personal property (and clearly there being no election at that time, at least) seems to me to show there had been no election of all of them to take as land, which occurred,

as I understand the claim, when James had arrived at the age of twenty-one.

" Now, there is no direct evidence of the declaration of that woman or her husband that either of them had made the transfer; the only proof of it is the general declarations, derived from so many sources, from different parties, that the others had sold out, and I think at this great length of time it might fairly be presumed that she or her husband had sold out; it being personal property as the land then stood it went to her husband, it became his when he married her, if he saw fit to reduce it to possession.] [33] Another of them married an Armstrong, and she died leaving three children, and another sister married the same Armstrong and then the remaining sister married John Hindman.

" [The plaintiffs allege that Llewellyn, John and Philip remaining at home, bought the interest of their sisters and the other brothers, James and Andrew, that is, all their interest in the land. Now, as I have said to you, it was not necessary that this should be in writing. They allege in addition, that after that was done, the mother still being living, they all consented by arrangement among them, and a partition of this land was made among themselves and to some extent partition fences made, and that Philip and John took their share together and treated it separately as their own, from that time until Llewellyn's death, and Llewellyn took his share of the land separately. Now, if they did that, if they were in possession, if they had bought out the others, whether by writing or verbally, and paid, or bargained for it, they being the sole parties interested in the land, at least in the remainder, with the consent of their mother, and I think even without her consent, could make a partition, and if they formally and absolutely divided it, then from that time it ceased to be personal property and became land as to them; to make that parol partition good they must have actually made it, agreed on the division line, and occupied it as such and recognized the respective titles in severalty in each other. If that were once done then the title would become good in each of them severally, and it would not be divested by any attempt of some of these parties afterwards, who had sold out their interest as personalty, to claim that because there was land and the transfer was not in writing it was not good,

and to repudiate it.   If any one sold his interest to these parties, or any of them, he could not afterwards convey a title, because he had none to convey.   And if the three being owners of all the interests made a division among themselves and entered into possession and occupied it as such, one or two of them could not afterwards repudiate and claim that he owned the whole of it.] [34]

"Now, it is a question of fact for you as to whether or not that was done.   The burden of proof to show that it was done is on the plaintiffs.   They claim they have done it, by abundant testimony or declarations of the different parties.   Several witnesses have testified as to the building of the house; I think there is no question that the brick house on the land in dispute was built in 1837, was marked and remains marked yet, according to the witnesses, with the initials of Llewellyn Howell; and that in 1839 a brick house was built on what was known as John Howell's end, and that was marked with the initials of John Howell, and John Howell continued to occupy that house from that time, as long as he lived.   Different witnesses tell you that John Howell pointed out to them the line, told them a certain fence leading from the Patterson line towards the McCormick line, which ran a considerable distance, was the partition line.   Another witness, perhaps two of them, says that in selling timber they cut to the line, and that each, John and Llewellyn, showed them the line and told them not to cut over it, and the declarations of John, Philip and Llewellyn that they had bought out the other interests, that they had made these divisions among themselves and that Llewellyn, in 1842, probably, possibly in 1844, built what was then a fine barn upon his share, and that he built a good spring house.

"The mother lived there.   John married; some of the witnesses say that was before the house on his end was built, some say afterwards, and some say that they don't know, but it was about that time.   There is not much doubt it was built in view of a marriage, and it is not very important.

"It is alleged that Philip went there; his declarations are proven that he and John had taken their end, and that he quarreled with John's wife, or rather when drunk had abused her and he had to leave, and he went back to Llewellyn's house. Philip does not seem to have been much of a farmer; there is

evidence that he cultivated sometimes on one side and some-
times on another, and that he ran the sawmill and had consid-
erable business as a thresher around the country.   On the other
hand, [it is also shown by some of these witnesses, there are
acts of Llewellyn acting as owner in the presence of the mother.
That the mother lived in the new brick house built on this por-
tion in question, is not in dispute, and that she died there, and
that she had some arrangement by which she had her living
is pretty certain.   There is no evidence or indication that she
was in any way discontented with it, and the will of Llewellyn
Howell asserts that she had her dower in this portion that he
claims to devise.] [35]   On the other hand, they allege that
this was a mere family arrangement, temporary, and not an
actual partition, and that Llewellyn and Philip, especially,
occupied in common.   Mr. Swanger is the principal witness to
that, in fact the only one.   He says that all the parties were
at home together at the time that the first house was built.   I
understood him all the boys—another part of his testimony
would indicate that he merely meant John, Philip and Llewel-
lyn, and certainly the weight of testimony is heavily that
Andrew and James were away from there before that time,
considerably.   According to the testimony, James came of age
about 1834 or 1835; he learned the cooper trade with his
brother-in-law, Hindman.

" [There is evidence also offered showing that in 1835 there
was a written conveyance and a formal assignment by the sister
who was then the wife of Armstrong, and her husband, joining
in the conveyance or assignment of their interest in this land
(the whole land left by their father) to Llewellyn, John and
Philip, and also by Mr. Armstrong, as surviving husband of
his deceased wife, another sister, conveying his interest in it,
or the interest of the wife, and while it provides for the children
conveying thereafter when they are of age, nevertheless it was
entirely good, unless there had been an agreement of all the
parties before that time to elect to take it as land, and I do not
see how there could be.   The conveyance is good ; it is not to
John, it is not to Philip, it is not to Llewellyn, but to John,
Llewellyn and Philip.] [36]

" Again ; the old lady died in 1853.   Then, for the first time,
any one who had not disposed of his or her interest could com-

pel the executors to proceed and sell under the will of Llewellyn Howell, Sr. It seems that the executors were dead, and John Howell had taken out letters of administration annexed to the will, and would have the powers of the executors. [Andrew Howell apparently repudiated his former sale to some of them, came into the orphans' court and filed a petition to have John Howell compelled to sell that land under the will of the father, and distribute the proceeds, to which there was an answer made by John Howell, under oath, in which he asserts that Andrew had sold his interest long before to Llewellyn, Philip and himself, and Andrew's petition was dismissed. It was probably filed on the assumption that only a written agreement would be valid, and John's answer is a very formal assertion as to Andrew's interest, that Philip and Llewellyn and he had bought it jointly, and corresponds with Andrew's statement of it before as testified to by witnesses.] [37]

" Now, when we come to the other portion of it, other questions arise. First, find this question,—and it is the great and important question in the case,—as to whether or not the plaintiffs are entitled to take here the entirety, or whether simply the interest of Llewellyn Howell, under the will of his father, which they have all said would be the eighth, if there was no partition.

" The first question logically, I think, for you to determine is: Did Llewellyn, John and Philip bargain and buy out their two brothers and their sisters, whether in writing or verbally, and then, having bought the interests by consent of their mother, make a partition of the ground that was distinct and visible, and make their improvements and occupy the property in that way, in severalty? The burden is on the plaintiffs to satisfy you by the weight of evidence that they did. If they did, then this portion that was allotted in that way and occupied by Llewellyn was his at his death, and he had a right to devise it. If it was not, he had not the right to devise anything but his undivided interest in it. If you find that they did, then we have other questions which are largely questions of law or equity. If the three brothers did so own it, having bought the others out and made partition on the ground among themselves and occupied it in that way, it established the title of Llewellyn, and John Howell could not controvert it.

" Now, as to the defendants in this case who are purchasers from John Howell, some other questions arise, and they are serious questions, but largely questions of law for the court. A purchaser without notice, or without circumstances and facts to put him on the proper inquiry, may take a good title where his vendor had a very poor title.   [In this case it was claimed for the defendants that they are entitled to be protected as innocent purchasers, because they had bought from John, who had quitclaims from the brothers and sisters, not from Llewellyn, and that they were not bound to inquire any further. We think differently.   Llewellyn Howell's title was right in the line of their investigation.   Until Llewellyn Howell's agreement to take as land and take whatever interest he had in this land as a whole was established, they could not take as land; they would only take equitable interests, assignment of the interests of others, and were bound to inquire as to Llewellyn's consent, and how it came.   Now, the only thing they had as to Llewellyn's consent was their knowledge of occupancy, or his will.   His will they admit they saw, and they were bound to look for it.   That will, in most unequivocal terms, presented to them an assertion on the part of Llewellyn Howell that he owned and had a right to devise the whole of his farm; not an undivided interest, but that he owned the farm on which he resided and the buildings thereon; and the portion which he wills to Andrew Howell for life, and then to those plaintiffs, was described as having the buildings thereon.   We think that put them on inquiry as to where Llewellyn Howell lived at the time of his death, and what buildings he occupied and what farm he claimed to have.   I say it is the only record evidence they have of Llewellyn's resolve to take as land, and that put them on inquiry as to the fact of his having elected to take his undivided interest and of having an actual fee in the whole of the tract on which he resided; and having that interest, they were then bound to make the necessary inquiries, and if there was evidence that he had lived on that tract, and on inquiry from the proper parties, which would not be merely John Howell or the parties that he was buying from, they could have found out the portion that Llewellyn had occupied in severalty; then if they did not make the inquiry they took at the risk of it being established that Llewellyn had the right he claimed under the will.

"Again, they claim under, and it was in the line of their title, and they set up certain ejectments. This family of the Howells does not appear to be a very harmonious one among themselves after Llewellyn's death, and first Andrew filed his petition in the orphans' court to compel John to sell and divide the proceeds under the will of the father; defeated in that, he and James bring an ejectment covering the whole tract of three hundred acres of which the father had died seized, and they were nonsuited in that; and, by the way, John tells them in answer to the petition that the only claim that Andrew has is under the will of Llewellyn. They brought another ejectment about as soon as they were nonsuited, claiming in the whole land, and were nonsuited—did not endeavor to go to trial. It was an assertion against their former assertion that they had sold it. Then in 1856, for the first time they bring an ejectment in reasonably proper shape, and they bring that ejectment as devisees of Llewellyn Howell.

"This land as then claimed was 'the land owned and occupied by Llewellyn Howell, Jr., at the time of his death.' They so described it and the case goes to trial and it is settled in the end.

"On the 17th of December, 1857, an agreement is come to (which simply binds themselves, but which I think is evidence in the case) by which James gets for himself fifty acres of land on the north side out of the portion that Llewellyn had devised to him and to his children, and he is to pay John, among others, the legacy that Llewellyn charged on the land, and the verdict is allowed to go against Andrew; and what would be the reasonable presumption is shown by the evidence to be true, Andrew was to get money.

"Judge Mellon tells us that when he came to buy, or in settling up the case, and wanting a quitclaim from Andrew, he himself paid the money, if not into Andrew's hands, in his presence, to make up the thousand dollars named in his quitclaim, and they had a memorandum of this agreement made at the time, or about the time of this ejectment, by which Andrew was to get one thousand dollars; and Andrew conveys his interest to John a day or two after the deed to Judge Mellon. Of course it inured to the benefit of Judge Mellon, and Andrew's interest in Llewellyn's land went to Judge Mel-

lon. Now, under that they had a right to possession; they had his title and under Llewellyn's will Andrew had a right to possession, and that ejectment is in my judgment notice of what was claimed in Llewellyn's will to be his farm. For this, and several other reasons I might mention,—but I think these are conclusive,—the purchasers from John Howell are not innocent purchasers for value without notice of this outstanding title. They took the risk of Llewellyn's devisees making good his assertion that he owned in fee and had a right to devise absolutely this farm on which he lived; and they ran the risk of the proof thereafter, and especially there is no protection to them in regard to the general interest that Llewellyn would have in the farm of his one eighth interest.] [38]

" There is another question that is a question of fact for you as to whether Llewellyn Howell, the third, the oldest of these parties, is entitled to recover against Judge Mellon. It is alleged that he is estopped by his acts. A man may be estopped by his talk from setting up absolute rights that he has. If I own a horse, having an absolute title to it, that is in the possession of Judge Reed, and he undertakes to sell it to the foreman of the jury, and I stand by and encourage him to sell, do not intimate that it is my horse, but on the contrary encourage him to sell it, I cannot turn around and say, ' That is my horse ; ' and if I prove it and it is admitted, the foreman will take the horse from me, and properly, because it would not be honest for me to stand by and allow the sale.

" [Now, Judge Mellon says that at the time he bargained, and between the bargain and the payment of the purchase money, young Howell, then of age, was present at different times, entered into discussions, and that he spoke of the James and Andrew trouble and their fight, and ' pooh poohed ' it ; said it was not any claim, that his father had bought out all the heirs. His after conduct, being in the employ of Judge Mellon, I do not think would amount to estoppel, but the question is this : Did Judge Mellon rely on these representations of Llewellyn Howell, Third, even in part, not as a whole ? Of course he would not rely on it altogether; but did that in part induce him to make that purchase and ignore these matters of record that ought to have put him on inquiry; if it did, then Llewellyn Howell, Third, cannot recover ; he is estopped. It is

a question of fact for you.   We have been asked to say it was
an estoppel; and also that it is not an estoppel; the jury must
determine that; it is a question of fact whether or not these
representations were made by young Howell, and whether
they were part of the inducement to Judge Mellon to pay his
money.] [39]

" There will be four forms of verdict which you can render.
If you fail to find that there was this acquiring of interest by
Llewellyn, John and Philip and the partition by them, then the
plaintiffs would only be entitled to the one eighth of this land,
Llewellyn being entitled to one eighth.

" If there was no acquiring of interest and no partition, and
if you should find that Llewellyn, Third, is estopped from claim-
ing, then you would find for the defendants as to Llewellyn How-
ell, and for the other plaintiffs for the six sevenths of the one
eighth.

" Then, if you find that there was that acquiring of interest
and the partition alleged by plaintiffs, you will find for the land
described in the writ, that is the whole of it, unless you find
that Llewellyn is estopped ; and if you find that Llewellyn is
estopped, then you find again for the defendants as to Llewel-
lyn Howell, and for the other plaintiffs for the six sevenths of
the whole.

" Judge Mellon suggests that I repeat about the question as
to whether or not Llewellyn had encouraged him to purchase ;
I mean, to consummate the purchase by means of paying pur-
chase money.

" Bear in mind that there are three Llewellyn Howells :
Llewellyn, the old man, who owned this ground away back in
1823 ; Llewellyn, Jr., his oldest son, who died in 1851, and
then Llewellyn Howell, the oldest of these brothers and sis-
ters, who is the son of John.

" I will mark these papers, gentlemen.   The first verdict,
which I have marked No. 1, is the one on the theory of the
plaintiffs that there was this purchase, partition and occupancy
on the part of Llewellyn Howell, and that the third Llewellyn
Howell is not estopped ; the one marked No. 2 will be on the
same theory, only that Llewellyn Howell is estopped by his
statement to Judge Mellon before the purchase was consum-
mated.   I have marked No. 3 the verdict on the theory of the

defendants that there was no partition between John Howell and Llewellyn Howell, and that Llewellyn's acts are not sufficient to estop him; and No. 4 will be on the same theory, assuming that you will find that Llewellyn's acts estop him from claiming.

" I will repeat: One and three are in favor of Llewellyn Howell, the present plaintiff, just as for the others; two and four are against Llewellyn Howell, the present plaintiff."

Plaintiffs presented the following point:

" If the jury believe from the evidence that, in the lifetime of Llewellyn Howell, Jr., and after all the children of Llewellen Howell, Sr., had become of age, Llewellyn Howell, Jr., John and Philip bought out all the interests of their brothers and sisters in the proceeds of the land devised by their father, Llewellyn Howell, Sr., deceased, by his will dated July 24, 1823, whether by contract made verbally or in writing; ·

" That, subsequently, with the assent of their mother, Llewellyn Howell, Jr., John and Philip elected to treat the land thereafter as land, and by division line run on the ground, also with the assent of their mother, made a parol partition of the land between them, one purpart, embracing the coal land now in dispute, being allotted to Llewellyn Howell, Jr., and the other purpart being allotted to John and Philip Howell;

" That, in pursuance to said partition, Llewellyn Howell, Jr., of the one part, and John and Philip of the other, entered into possession of their respective purparts, and thereafter each made valuable improvements and exercised other acts of exclusive ownership over his or their purpart, until the death of Llewellyn Howell, Jr., in 1851;

" That by the will of Llewellyn Howell, Jr., dated January 22, 1851, and duly admitted to probate, in evidence, the land in dispute, to wit: sixty-four and one half acres, more or less, being the one half of the land allotted to and taken by Llewellyn Howell, Jr., under said parol partition, was devised to Andrew Howell for life, and on his death without issue to John Howell's children; and further,

" That after the death of said Llewellyn Howell, Jr., his devisee, Andrew Howell, died without issue, and that thereafter John Howell died leaving the plaintiffs in this case as his children,

" Then (if the jury find the foregoing facts), no sufficient defense has been shown against a recovery by the plaintiffs in this case, and the verdict of the jury should be in favor of the plaintiffs."

By the Court : " Affirmed." [23]

Defendants' points were as follows :

" 3. Also, as to the alleged partition or division line between John and Llewellyn, that the evidence is insufficient in this, viz : that it was not shown when and how and where located with sufficient certainty, and by whose authority, or that it was not merely to designate that part which the widow permitted John to occupy, from the part which she retained to herself and Llewellyn and Philip, who continued with her; nor is it shown that, before it was made, all the heirs had consented to look to the land as such, and waive a sale, and besides, there was no continuous fence or other prominent landmarks on the ground to attract attention to the alleged line when Mellon purchased in 1863, and had no notice or intimation of such a line till a year or more afterwards. *Answer :* The 3d point is refused. If the evidence of the plaintiffs is believed, it is sufficient to establish a purchase by Llewellyn, John and Philip, of the interests of their other brothers and sisters in the whole farm and its proceeds, and that they being owners thereof with consent and agreement of their mother, made a parol partition of the land among themselves, by which the share of Llewellyn Howell, Jr., was set apart by definite metes and bounds and occupied by him as such to the time of his death. It is a question of fact for the jury." [24]

" 6. The uncontroverted evidence shows that all had consented to waive a sale and take or look to the land for their shares, and that all jurisdiction of the Orphans' Court over the subject-matter had ceased long before Mellon purchased. *Answer :* The 6th point is refused. It is a question of fact for the jury. The court would find the facts to be as alleged in the point. [25]

" 7. That the character of land being thus restored, Mellon was entitled to rely on the record title, and was not affected by any secret sales or trust by or between the legatees, and not recorded when he bought. *Answer :* Refused, except as it is answered in the general charge." [26]

" 11. Fraud is not alleged or presumable, without more or better evidence to raise a presumption of conspiracy between John and his five brothers and sisters to defraud his children out of a contingent remainder of the land in dispute ; or to enable him to defraud purchasers, and still preserve the contingent remainder to his children.    The five deeds to him are therefore unimpeached, and his honesty remains intact; and it must be inferred that Llewellyn's interest beyond his one eighth was insignificant or forfeited, by reason of nonpayment or compliance with the conditions of the parol executory agreement under which he claimed ; or was canceled by some settlement or arrangement of him and John, between the date of Llewellyn's will and time of his death.    *Answer :* Refused. [27]

" 12. Then (if defendants' 11th point as to fraud is refused) on the hypothesis of the compromise verdict in the last of the three ejectment cases of Andrew and James against John in 1857, viz : that the mother had permitted Llewellyn and John, under an understanding between them, and between them and some or all of the brothers and sisters, to divide the place, subject to the rights of such of the others as had not given their consent, and with the purpose or intent of paying for and acquiring the shares or interests of the others, as they could afterwards ; then, to instruct the jury to bring in a conditional verdict for so much as John had advanced beyond his proportion, in paying off the others in Llewellyn's lifetime, together with what he advanced and the expenses he incurred after Llewellyn's death, in paying for and acquiring title to shares after Llewellyn's death, with interest thereon from the dates of such payments and expenditures.    *Answer :* The 12th point is refused.    There is not sufficient evidence of any such preponderance of payment as would justify the jury in finding an amount. [28]

" 13. That the will of Llewellyn Howell, Jr., was not constructive notice to the Youghiogheny River Coal Company or to W. L. Scott of adverse title, and that no actual notice to them has been shown by the evidence.    *Answer :* Refused. [29]

" 14. That the ejectment proceedings of Andrew and James Howell v. John Howell et al., at No. 531, November term, 1856, was to the Youghiogheny River Coal Company and W. L. Scott constructive notice only as to the title of the fifty

acres therein awarded to James Howell, and not of the title to the land claimed in this suit, and that no actual notice of said suit to them has been shown by the evidence. *Answer :* Refused. [30]

" 15. That the defendants, W. L. Scott and the Youghiogheny River Coal Company are, under the evidence in this case, bona fide purchasers for value of title of Thomas Mellon to the land in suit, without notice, actual or constructive, of the adverse title set up by plaintiffs, and are, therefore, protected therefrom. *Answer :* Refused." [31]

*Errors assigned* were (1–22) rulings on evidence; (23–39) instructions as above, quoting them.

*William B. Rodgers* and *J. McF. Carpenter*, *P. C. Knox* and *James H. Reed* with them, for appellants.—A. Under elementary rules the testimony of the declarations relied on was inadmissible, but if any of it was admissible, such part or parts were insufficient and incompetent to establish appellees' parol purchase of shares, or the parol consent necessary to reconvert the land to realty, or the parol partition alleged; and failing as to any one of these three propositions, the appellees' case fails.

B. The evidence in the case discloses several distinct facts, which rendered the reconversion of the land to realty or parol partition impossible in Llewellyn, Jr.'s lifetime, viz : 1. The widow's outstanding life estate expressly giving her exclusive possession. 2. Mary's share outstanding in her husband. 3. Sarah's share outstanding in her minor children, and their incompetency during minority to give consent to accept the land. 4. Andrew and James' shares also outstanding, as appears in the proceedings and the result of the three ejectment cases.

C. Reconversion of the land to realty after Llewellyn, Jr.'s death, viz : 1. By the death of Mary's husband shortly after or perhaps before the death of the widow, her share devolved on the remaindermen or their assigns, and thereby the number was reduced from nine to eight. 2. James's share was set apart to him in land in 1857 by compromising the third ejectment. 3. Llewllyn, Jr., by his will unequivocally elects to take in land, which would apply to any interest he had, more or less.

4. John acquired five shares by deed, which with his own made six, thus completing the consent of the remaining eight after the death of Mary's husband.   This all appeared on the judicial and county records, and thereby the land was restored to realty in 1857, six years after Llewellyn, Jr.'s death, and six years before Mellon, the first named appellant, made his purchase.

D. By restoration of the land to the status of realty its legal title was restored according to the interest and ownership therein at the time of its restoration, as manifested on the judicial and county records, and Mellon, the purchaser from John, took a legal title, as also did the other two defendants successively as they purchased afterwards, and from the time of the reconversion to land, James having had his share set apart to him, the appellees and Llewllyn, Jr.'s devisees became tenants in common in the residue, one undivided eighth part in the devisees (appellees) and seven undivided eighth parts in the appellants.

E. When Mellon purchased there was nothing whatever on the premises to indicate a previous ownership or occupancy by Llewellyn, Jr.; and nothing on the public records to indicate any other interest or ownership in the land by him other than his individual share under his father's will, and Mellon, the first purchaser from John, made diligent inquiry of all who were yet living and had been connected with the title in any way, and the attorneys on both sides in the protracted litigation occurring after Llewellyn, Jr.'s death, and was uniformly informed that Llewellyn, Jr.'s will could relate only to his individual share under the father's will, as he never had acquired any other.

F. If there was anything overlooked by Mellon or the other purchasers in making inquiry as to the title of outside parties, such as those testifying to declarations on the trial, they were unknown to Mellon at the time, and if negligence can be attributed to Mellon or the other purchasers under him, the appellees are precluded by the equitable defense arising from the gross laches and contributory negligence of Llewellyn, Jr., in disregarding all the ordinary and usual methods of acquiring and evidencing ownership of choses in action of the kind in question, and the negligence of the appellees since his death in with-

holding all notice from the purchasers that they claimed a larger share in the land by a separate and different title,—purchase by parol in their devisor,—than that which the records of the county show to have been vested in him.

G. The foregoing positions of defense are separate and independent of each other, and if any one of them prevails the appellees' case is defeated except as to the part conceded, viz: the one undivided eighth under the father's will. As to such of the errors assigned as would result only in a retrial of the case, they are too numerous to mention in detail, but are presented under their appropriate specifications.

The acts and declarations relied on must have such clearness and directness as will leave no doubt as to their meaning and purpose: Allison v. Burns, 107 Pa. 50. The declarations of a vendor after he has parted with the title are not admissible to impeach the title of the vendee: McLaughlin v. McLaughlin, 91 Pa. 462; Smith v. Gibson, 1 Yeates, 291; Com. v. Knapp, 9 Pick. 507; Jackson v. Payne, 114 Pa. 67; McIldowny v. Williams, 28 Pa. 493; Silliman v. Haas, 151 Pa. 52; McGinity v. McGinity, 63 Pa. 38. The loose declarations of one who claims land, in relation to his title, are not to be relied on and used as evidence to defeat a title otherwise good: Sandford v. Decamp, 8 Watts, 542; Miller v. Holman, 1 Grant, 244; Salem Bank v. Gloucester Bank, 17 Mass. 27.

When an attempt is made to establish title to land under a parol contract, proof thereof in all its essentials and in all its equities should be so plain and clear as to preclude doubt or hesitation as to the contract and the equities arising therefrom: Miller v. Zufall, 113 Pa. 317; see also Sower v. Weaver, 78 Pa. 443; Shellhammer v. Ashbaugh, 83 Pa. 24; Edwards v. Morgan, 100 Pa. 330; Moyer's App., 105 Pa. 432; Burgess v. Burgess, 109 Pa. 312.

Every presumption is against the claimant under such a sale: Ackerman v. Fisher, 57 Pa. 457. Facts dependent on the candor, intelligence and memory of the witnesses are for the jury. Where the truth is determined by inferences or probabilities from established or undisputed facts, it is for the court: Kittel's Est., 156 Pa. 445; Del. & C. R. R. Co. v. Cadow, 120 Pa. 559; Cougle v. McKee, 151 Pa. 602; Brown v. Barnes, 151 Pa. 562.

When in an ejectment the plaintiff rests his title upon an alleged parol contract of sale of the property in dispute, he is seeking in effect a decree of specific execution, and the burden is upon him to show a contract complete in its terms, and such partial performance, including a taking of possession in pursuance of the contract, as would make it unjust and inequitable not to execute it: Reno v. Moss, 120 Pa. 49; Miller v. Specht, 11 Pa. 449.

A bona fide purchaser without notice is not affected by notice to his vendor: Bond v. Stroup, 3 Binn. 66; McElroy v. Braden, 152 Pa. 81; Hottenstein v. Lerch, 104 Pa. 454; Bryan's App., 101 Pa. 394. Neither vague reports of strangers, nor information given by a person not interested, respecting a defect of title, will affect a purchaser without a notice: Kerns v. Swope, 2 Watts, 75; Duff v. Patterson, 159 Pa. 312.

Where the evidence in an ejectment suit tends to show that A was present when B purchased property from C and assisted the parties and subsequently permitted B to expend money in improving the same, under the impression that he had secured a good title, the court should charge that if the jury believe A knew these facts, then both he and those claiming under him were estopped from setting up an outstanding title against B: Wahl v. Pittsburg & Western R. R. Co., 158 Pa. 257. The resumé should be as full on one side as on the other: Gehman v. Erdman, 105 Pa. 371; Reber v. Herring, 115 Pa. 599; Leibig v. Steiner, 94 Pa. 466.

Though the law be stated correctly, yet if the court so comments upon the law as to practically take away the effect of the statement, and influence them into disregarding it, it is error: McFadden v. Reynolds, 20 W. N. C. 312; Quinby v. R. W. Co., 2 Del. 285.

*Boyd Crumrine, J. P. Patterson* and *D. F. Patterson* with him, for appellees.—The purchaser of an imperfect title (or rather of no title or interest at all, either legal or equitable, to the land in this case), is bound to know what title or interest he is buying; and if it be not a title perfect on its face, that ultimately he will get nothing by his purchase; in short that he buys at his peril. Caveat emptor is the rule: Chew v. Barnett, 11 S. & R. 392; Knapp v. Bailey, 79 Me. 195, cited in 16 Am.

& Eng. Ency. of Law, 790; Pringle v. Pringle, 5 Sandf. (N. Y.) 157.

Possession of land for a long period, after a purchase of it at a sale for taxes, affords a presumption that the formal provisions of the act of assembly regulating such sales were complied with: Coxe v. Derringer, 78 Pa. 289; Jones v. Bland, 112 Pa. 176; Carter v. Tinicum Fishing Co., 77 Pa. 315; Foulk v. Brown, 2 Watts, 214; Richards v. Elwell, 48 Pa. 361; Brock v. Savage, 31 Pa. 410.

Evidence sufficient to establish a parol sale of land is not required to prove a parol partition; it is not for the court but for the jury, as in other cases: McKnight v. Bell, 135 Pa. 370.

Observe, that in the will of Llewellyn Howell, Jr., there are definite and specific dispositions of the farm "*whereon I now reside*" as his own land; and this is an assertion of title in him to the land as land while in possession thereof. The will was not a general devise of " all his real estate," which might be operative upon any kind of interest in real estate he might own at his death. But, whatever it was, John Howell, having recognized the will as a valid will and pleaded it in solemn judicial proceedings, is estopped with his privies from claiming against it: Miller v. Springer, 70 Pa. 269; Duffey v. Pres. Cong., 48 Pa. 46; Spaulding v. Eimers, 3 Pittsb. 306; Putnam v. Tyler, 117 Pa. 570; Root v. Crock, 7 Pa 378.

The evidence was sufficient to establish the purchase of the outstanding interests, as against the defendant in this case, and also as to the effect of the estoppel as to John and those now claiming under him: Mellon v. Reed, 114 Pa. 647; Same v. Same, 123 Pa. 1.

" In a partition of lands between tenants in common, who derive their estate by descent, there is an implied warranty of title. Hence, in an action of ejectment by one of them, for a part of the land allotted to him, another of those who were tenants in common with him is not a competent witness for the plaintiff :" Weiser v. Weiser, 5 Watts, 280; Paterson v. Lanning, 10 Watts, 136; Seaton v. Barry, 4 W. & S. 183; Feather v. Strohecker, 3 P. & W. 506; Sawyers v. Cator, 8 Humph. 256 (47 Am. Dec. 608); Morris v. Harris, 9 Gill (Md.), 19.

Not only is there no evidence on the part of W. L. Scott or the Youghiogheny River Coal Co. that they were without no-

tice of the plaintiffs' title, but none that to constitute them bona-fide purchasers they had paid the purchase money; they were required to prove the actual payment of the purchase money by other evidence than the recital of their deeds.

OPINION BY MR. JUSTICE WILLIAMS, July 18, 1895.

This is an important case, whether regard be had to the value of the property in controversy, or to the questions involved. The assignments of error are thirty-six in number and cover thirty-five pages of the appellants' paper-book. The printed briefs aggregate about two hundred pages more. It is by no means easy to arrange and condense the facts and the questions presented by them so as to bring a discussion of them within reasonable limits. Nearly seventy years before this suit was brought Llewellyn Howell, Sr., who owned the farm of which the land in controversy was part, died testate. He left a widow and nine children to survive him. He gave the use of his farm to his widow until the youngest child should come of age, and directed that it should then be sold. One third of the purchase money was to be invested for the use of the widow during life and the other two thirds to be divided among the children. He gave to his widow, however, the right to elect whether the sale should take place at the time designated by him, or not until her own death. She elected that it should remain unsold. She survived her husband about thirty years, dying in February, 1853. The plaintiffs are the children of John Howell, one of the sons of Llewellyn Howell, Sr., but they claim title as the devisees of Llewellyn Howell, Jr., who was another of the sons of Llewellyn Howell, Sr. To support their title they rely upon parol sales alleged to have been made in 1836 and 1837 by the children of the elder Howell to their three brothers, John, Llewellyn, Jr., and Philip; and a subsequent parol partition between the purchasers by which the land now in controversy became the property of Llewellyn, Jr.

The defendants claim under John Howell, the father of the plaintiffs who claimed to be the owner of seven eighths of the land as heir at law and as the vendee of six other heirs at law of his father from whom he held conveyances of their title. It is conceded on all sides that the will of Llewellyn Howell, Sr., converted his farm into personalty; and that the share of each

of his children was not land, but a sum of money out of the proceeds of the sale which his executors were directed to make. But it was competent for the devisees to relieve against this conversion by agreement, and restore the property to its original character as real estate.   The plaintiffs allege that this was done at the time the parol sales under which they claim were effected, and the parol partition made between the purchasers. The defendants insist that no parol sales were in fact consummated, and allege that the re-conversion took place when the several heirs at law conveyed to John Howell, their grantor. There is therefore no allegation that the interest or title of either party is now personal, and no denial that for at least thirty years it has been restored to its original character as land.

This is an equitable ejectment.   The plaintiffs are asserting a title that rests on the alleged parol contracts of sale and the alleged subsequent parol contract for partition.   They are out of possession, and for about forty years the defendants have been in possession claiming title.   The plaintiffs must recover, if they recover at all, upon the strength of their own title, for the defendants may stand upon their possession until a valid title is established in the plaintiff.   Potior est conditio defendentis is a maxim of equity as well as of law, and the defendants are not called upon to defend their possession until the plaintiffs establish a title that is good, prima facie, to the land in controversy.   Was such a title shown, or was the evidence in support of it submitted to the jury under suitable instructions ? The title set up was as to one share, or an equal undivided eighth part, the title of Llewellyn Howell, Jr., under his father's will; and as to the other seven eighths it was the title of his brothers and sisters under the same will which it was alleged he held.   The title of two of his sisters appears to have been conveyed by deed to him and his brothers Philip and John as tenants in common.   These deeds were found in the possession of John and no reason for disregarding them has been shown.   So far as the evidence indicates they were valid conveyances, and they left nothing in the respective grantors to pass by their subsequent deeds to John.   Llewellyn, Jr., appears therefore to have held at least his own share and an undivided one third of the two shares of his sisters Sarah and Martha.   The shares

of James and Andrew and of Esther and Mary it is alleged
were bought by the three brothers John, Llewellyn, Jr., and
Philip as tenants in common; and the interest of John and
Philip in the land in controversy, it is claimed, passed to Llewel-
lyn, Jr., by a parol contract for partition which was executed
by the running and marking of a division line on the ground,
and by a continued use or possession in accordance therewith
extending up to the death of Llewellyn, Jr., in 1851. It will
thus be seen that as to four shares the title of Llewellyn, Jr.,
rested on separate parol sales; and as to the shares of John and
Philip, as devisees, and as tenants in common of the shares
acquired by purchase, it rested on a parol partition.

I am unable to discover the proof of a parol contract made
between the three brothers and either of the other heirs for the
purchase of his or her share at an agreed price. The existence
of such contracts must be gathered, so far as the proofs before
us show, from the declarations of the parties made to strangers
in the course of conversations of which we have but a fragment
before us. These declarations are general and indefinite in
their character and do not show any of the terms of either of
the alleged contracts. Thus one witness says he heard John
and Llewellyn, Jr., say they had bought out their brothers and
sisters. The same witness says that as late as 1848, some ten
years after the alleged partition was had, he heard Llewel-
lyn, Jr., say that he would be able to pay off the heirs out of
the proceeds of the timber on the land. Another witness says
that in 1840 Lewellyn told him they had bought out the other
heirs, had paid part of the purchase money and were going to
pay the balance. Still another says that John and Llewellyn
told him they had bought out all of the heirs. The proofs of
the parol partition are equally wanting in definiteness and cer-
tainty. There is no proof of an agreement to divide what they
had before held in common. There is no proof of the actual
running of a partition line on the ground by the parties. The
existence of the line and its purpose must be gathered from
the declarations of the parties to persons in their employ and to
their neighbors. Thus Mr. Ball testifies that John and Llewel-
lyn showed him a fence and told him it was the dividing line.
McFadden says there was no fence right on the line but within
" maybe ten rods and some places not so far. It run down to

what was called the Murphy line. It didn't follow the line right through." Dougherty says he worked up to a fence they called the division line, and that he understood Llewellyn had the north side of it and John the south side. In answer to this question, " Did they state to you when or how they divided it?" (the farm,) he said "not to my recollection."

The fact that two brick houses were built upon the land was greatly relied on as showing that a partition had been made ; but these houses were built of brick made by John and Llewellyn in common, and during the lifetime of the mother. Llewellyn and his mother lived in one. John and his family lived in the other.

Under what arrangement with their mother the life tenant, or with each other, the occupancy of the farm was divided or the houses built the evidence is silent. This was the case of the plaintiffs. We do not say it should not have gone to the jury, but we do say that if submitted to the jury it should have been done with care and with very definite instructions as to what it was necessary the jury should find in order to sustain the plaintiffs' title.

But there was pertinent and important evidence on the part of the defendants that was entitled to the like careful treatment. As to the parol sales it is clear that each of the alleged vendors took a different view of the effect of the negotiations between themselves and Llewellyn from that which he entertained. They have, each of them, made a sale to John since Llewellyn's death and executed a deed to him for the respective shares held by them. They disavow and repudiate the sale alleged to have been made by them by parol, and assert their ownership after Llewellyn's death and the probate of his will. His two alleged cotenants repudiate the purchases in common and the subsequent parol partition set up by the plaintiffs. Llewellyn died in January, 1851. The sale by John to Mellon did not take place until Aug. 25, 1863.

The third action of ejectment brought by James and Andrew against John terminated in a verdict in favor of James for fifty acres in the extreme north end of the original farm in 1857. Since that time at least John has been in the undisputed occupancy of all the rest of the land occupied by Llewellyn and his mother, including the land now in controversy. That he

had been in the exclusive occupancy from the time of Llewellyn's death, subject only to the life estate of his mother is fairly inferable from the fact that the first action of ejectment brought by James and Andrew was begun in June, 1852. The mother was still living in the house which Llewellyn had occupied with her from the time of its erection and was made a codefendant with John and Philip in the action. These significant circumstances should have been set over against the indefinite declarations relied on by the plaintiffs to prove the several parol sales, and the parol partition on which their title to most of the land claimed depended. The attention of the jury, having been drawn by the learned judge to the proofs on the part of the plaintiffs, should have been drawn to the evidence in reply thereto by the defendants, and they should have been directed to consider it in determining the weight to be given to the testimony of the aged witnesses who undertook to give declarations made in their hearing a half century before they were called to testify to them. The important questions for the jury were, first, does the evidence fairly show the actual making of the parol sales under which the three brothers acquired the title of their brothers and sisters in the farm? If not then the plaintiffs can only recover the undivided share which Llewellyn holds as heir at law of his father and one third of the shares of his sisters Sarah and Esther.

If the jury should reach the other conclusion, that the parol sales are satisfactorily proved, then the second question relates to the parol partition. If this is not established the plaintiffs cannot recover though the jury should find for them upon the first question. But if both questions be found for the plaintiffs then they should recover in this action the land they claim. In considering the second question the erection of the two houses does not seem to us to play any important part. One of them was built about 1837 and the other about 1839. The brick for both were prepared and burned by the family, or such of them as then lived at home with the mother, and the work upon them was done in the same manner. The houses were apparently built by a common effort and for the common benefit.

The marriage of John did not occur till three or four years later, and he continued to live with his mother till his marriage

took place. He then moved into the house on the southern part of the farm which had not previously been occupied. There is nothing in all this that bears with any directness on the making of a contract or partition between John, Llewellyn and Philip as owners in common. The proof offered to show the making of a division line separating the farm into two pur-parts by way of amicable partition between the three brothers is, to say the least, vague and uncertain. When the line was settled upon, for what purpose it was intended, and just where it ran it would be difficult to determine from the evidence. The jury should have been told what facts it was necessary for them to find in order to justify them in sustaining the alleged parol partition, and their attention should have been drawn to the evidence from which these facts must be found if found at all.

The trouble with the charge is in its manner and general effect. The learned judge seems to have been satisfied by the evidence that the parol sales were established and the partition and the boundary line made as alleged by the plaintiffs. He instructed the jury in answer to the defendants' third point, " If the evidence of the plaintiff is believed it is sufficient to establish a purchase by Llewellyn, John and Philip of the inter-ests of their other brothers and sisters in the whole farm and its proceeds, and that they being owners thereof with consent and agreement of the mother made a parol partition of the land among themselves by which the share of Llewellyn Howell, Jr., was set apart by definite metes and bounds and occupied by him as such to the time of his death. It is a fact for the jury." But this left to the jury little but the question of credibility. They were told that the evidence was sufficient to establish the title of the plaintiff " if it is believed." It was the credibility of the plaintiffs' witnesses, and not the vague and uncertain character of their testimony, to which the attention of the jury was directed. Their testimony might all be true and yet the jury might not have been able to find from it the several parol contracts of sale, or that if made in terms they were ever actually carried into effect. The subsequent conduct of all the parties was inconsistent with the sales alleged, and the duty of the jury was to determine not a question of credibility merely, but a question of the weight of the evidence taken as a whole.

Did it show in a satisfactory manner the making of the various parol agreements alleged, or were the declarations proved by the witnesses consistent with the existence of negotiations that did not, except in the cases of Martha and Esther, ripen into valid agreements of sale ? The assignments of error numbered with Roman numerals 24, 27, 28 and 34 present instructions that are objectionable as presenting in too strong a light the facts relied on by the plaintiffs, without any allusion to the circumstances presented by the defendants as an answer to them. These circumstances were entitled to a careful consideration, and while remaining uncontroverted and unexplained were inconsistent with the theory of the plaintiffs, and a forcible reply to it.

In all other respects this case was tried with ability and with great clearness by the learned judge, but the conclusion is not easily to be avoided that the charge as a whole was calculated to lead the jury to a verdict in favor of the plaintiffs by the prominence it gave to the plaintiffs' case, and by its failure to present the circumstances relied on by the defendants as an answer thereto.

The judgment is reversed and a venire facias de novo is awarded.